**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 14-50-DLB-JGW**

**MELINDA GRIZZELL**                                                                 **PLAINTIFF**

**vs.**                          **MEMORANDUM OPINION AND ORDER**

**CITY OF ALEXANDRIA, et al.**                                               **DEFENDANTS**

********************

## I.      Introduction

This matter is before the Court upon Plaintiff Melinda Grizzell's Motion for Partial Summary Judgment (Doc. # 25) and a Motion for Summary Judgment (Doc. # 26) filed by Defendants City of Alexandria, Alexandria Police Department, Mayor William Rachford and Chief Michael Ward (collectively, "the Alexandria Defendants").  Both Motions focus on whether Grizzell has established a prima facie case of the following claims: (1) Title VII hostile work environment; (2) Title VII retaliation; (3) disability discrimination; (4) defamation; and (5) intentional infliction of emotional distress.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367.

## II.      Factual and Procedural Background

The Alexandria Police Department ("APD") hired Grizzell as a police clerk in 1997.  (Doc. # 31 at 28, 34-35).  Her duties included distributing mail, answering phone calls, assisting visitors, filing documents, typing police reports and making arrest jackets.  (*Id.* at 36).  Although APD hired her to work part-time, she became a full-time employee within a

year.  (*Id.* at 30, 34).

In 1998, Gary Farmer became the APD Chief.  (*Id.* at 34-35).  He often directed sexual comments at Grizzell, compared her physical appearance to that of women on television and purposely tried to upset her.  (*Id.* at 146-48).  Lieutenant Dan Wittrock and Officer Mike Welch engaged in similar antics and passed gas in Grizzell's face.  (*Id.*).

Grizzell filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in 2000.  (*Id.* at 148-49).  After filing the Charge, Grizzell received a phone call from an unidentified woman, who stated "Mike is going to hurt you," and hung up.  (*Id.* at 201-02).  Grizzell thought she recognized the voice as that of Officer Welch's wife.  (*Id.*).  The EEOC ultimately found that "there is reasonable cause to believe that Respondent [APD] has violated Title VII by subjecting the Charging Party [Grizzell] to sexual harassment, discipline, and different terms and conditions of employment because of her sex."  (Doc. # 33-1 at 7).  Although Chief Farmer left APD shortly thereafter, some of the other alleged harassers continued to work there.  (Doc. # 31 at 148).

Michael Ward became the APD Chief in 2001. (Doc. # 33 at 17).  Lieutenant Colonel Joe Alexander became Assistant Chief.  (Doc. # 31 at 46).  Early in his tenure, Chief Ward hired Mary Morscher and Lisa Childers as part-time police clerks.  (*Id.* at 36-39).  Grizzell became their supervisor.  (*Id.*).  Although Ltc. Alexander was Grizzell's immediate supervisor, she worked directly with Chief Ward far more regularly.  (*Id.* at 46).  Grizzell and Chief Ward enjoyed a positive working relationship for almost ten years.  (Docs. # 31 at 44-45; 33 at 30-33).  Professional disagreements occasionally developed between the two, but they were always able to resolve their differences.  (*Id.*).

On several occasions, Grizzell felt uncomfortable as the only female supervisor in APD. (Doc. # 31 at 86-88). Her male counterparts allegedly told her to "hold her ears" before supervisor meetings, then proceeded to make inappropriate comments. (*Id.*). For example, Grizzell testified that Chief Ward and Lieutenant George Schreiner once had a detailed conversation about feminine hygiene products, which made her uncomfortable enough that she asked them to stop. (*Id.* at 80). Chief Ward denied that such a conversation took place. (Doc. # 33 at 58).

According to Grizzell, Chief Ward commented on a monthly basis that men were better than women because they would take things behind the woodshed, while women just wanted to talk things out. (Doc. # 31 at 72-76). Sometimes he made this observation at the supervisor meetings, where Grizzell was the only female present. (*Id.*). Although she often "cringed" at these comments, she did not complain about them because they "did not cause measurable harm." (*Id.*). Instead, she tried to work around them. (*Id.*). Chief Ward insisted that his statement was taken out of context and that he was simply seeking parental advice from Morscher and Childers about how to cope with his daughters' frequent bickering. (Doc. # 33 at 51-54).

Grizzell also alleged that Chief Ward told the female clerks about getting a "woody" when he saw a boat full of topless women. (*Id.* at 92-93). Chief Ward admitted that he told a story about seeing topless women in Europe, but denied describing his physical reaction to the sight. (Doc. # 33 at 56-58). He explained that it was part of a conversation he had with Morscher about the culture shock that comes with overseas military service. (*Id.*). Morscher testified that she did not find the story to be inappropriate in context, adding that "[i]t was a conversation we were having about being in the military, and my son was in the

3

military, and you know, we're 50 years old and we talk as friends." (Doc. # 32 at 10-11).

Grizzell then testified that Chief Ward once told her and Childers about the sexual appetites of his former co-worker, who only allowed his wife three days off from sex during menstruation. (Doc. # 31 at 91). When asked about this conversation, Chief Ward explained that Childers had also worked with the man in question, and they were simply recalling the time that he voluntarily shared such intimate details. (Doc. # 33 at 59).

Tensions between Grizzell and Chief Ward mounted in late 2012. Grizzell began working on the City's new community event called Christmas in Alexandria ("CIA"), which she characterized as "a joyful stress." (Docs. # 30 at 86-87; 31 at 43, 142-43; 33 at 201). Her mother also testified that Grizzell "enjoyed the project thoroughly." (Doc. # 34 at 8). However, Chief Ward and Mayor Rachford remember her being very stressed about the event, to the point of preparing a resignation letter. (Doc. # 33 at 200-01). Mayor Rachford "knew she was under a lot of stress," but he "essentially talked her out of resigning." (Doc. # 30 at 126-27).

Meanwhile, Chief Ward considered possible improvements to APD's software scheme. (Doc. # 33 at 114-15). On December 4, 2012, Chief Ward, Ltc. Alexander, Lt. Schreiner and a patrol officer met with the Kentucky Data Interoperability ("KDI") system software developers.[1] (Docs. # 31 at 48-50; 33 at 114, 117-18). Chief Ward invited Grizzell to this meeting because she managed the office records well and had once worked on a program called e-CallResponse. (*Id.* at 120).

---

1) KDI is a software initiative spearheaded by Northern Kentucky law enforcement agencies. (Doc. # 33 at 113-114). It is designed to facilitate the flow of information between officers in the field. (*Id.*).

4

When Chief Ward began describing his vision for the software update, Grizzell suggested that they model the software after a system used by her former corporate employer.  (Docs. # 31 at 52; 33 at 121-22).  According to Grizzell, Chief Ward became combative in front of their guests, telling her that he did not want police officers to become "data entry people" and blaming her for deficiencies in the e-CallResponse program.  (Doc. # 31 at 53-55).  She testified that she was "met with hostility the whole time, and [ ] couldn't understand it" because she was only trying to offer suggestions, as Chief Ward had instructed.  (*Id.*).  Chief Ward asked Ltc. Alexander if he was not being clear, but when Ltc. Alexander tried to respond, Grizzell commented that he would say whatever Chief Ward wanted to hear.  (*Id.* at 60).  She left the room in tears and did not return to the meeting.  (*Id.* at 54, 57-58).

However, Chief Ward testified that Grizzell interrupted him as soon as he began speaking.  (Doc. # 33 at 100, 122).  He felt that her behavior "elevated to the point of almost conduct unbecoming [because s]he was arguing with the chief of the organization that she didn't agree with the direction that I was going and she was arguing that in front of everybody."  (*Id.*).  When Chief Ward asked Ltc. Alexander if he was being unclear, Grizzell "verbally attacked him."  (*Id.* at 123).

Grizzell and Chief Ward discussed the incident the next day.  (Doc. # 31 at 70; 33 at 193).  When he asked her what had happened at the meetings, she first explained that she felt disrespected.  (*Id.* at 71).  Grizzell then confronted him about his inappropriate comments, explaining in her deposition that the December 4th meeting was "the straw that broke the camel's back" and she had "the perfect opportunity to tell him that this type of behavior needs to stop."  (*Id.*).  Their heated discussion lasted "maybe an hour or less."

5

(*Id.*).  Grizzell testified that they calmed down, then spent another hour discussing the proposed KDI improvements, as well as possible gender difference communications/organizational effectiveness training. (*Id.*).  Grizzell was "exhausted" when she left Chief Ward's office, but felt like they would be able to put this disagreement behind them.  (*Id.*).

According to Chief Ward, Grizzell began yelling at him after he asked her what had happened at the meeting.  (Doc. # 33 at 97-98).  He estimated that he spent the first hour and a half of the meeting "letting her vent" because he could not get a sentence in without her interrupting and other employees in the office were able to hear her.  (*Id.*).  He described her behavior as akin to that of a victim, in that "she was very upset and he could not get information from her because she was rambling."  (*Id.* at 136).  For example, Grizzell allegedly accused him of treating her the same way the City had during the previous EEOC Charge, which pre-dated Chief Ward's tenure with the City.  (*Id.* at 99).

Chief Ward felt that Grizzell's behavior was "out of character for her."  (*Id.* at 102).  He suspected that stress over CIA caused this outburst, but wanted to find out for sure what was going on. (*Id.* at 102, 130).  Chief Ward drafted a Record of Counseling ("ROC"), in which he referred her to counseling through the Employee Assistance Program ("EAP"):

**9. SUMMARY OF COUNSELING:**

On Tuesday, December 4th during a meeting an exchange between Melinda and myself occurred.  Although this exchange appeared to be a simple disagreement on work related issues, Melinda left the room shortly afterwards and did not return to the meeting.

On Wednesday, December 5th I asked Melinda to come into my office to discuss our exchange and difference of opinion from the previous day.  I had hoped that a 24 hour cooling off period was in order prior to meeting with her.

6

Melinda expressed deep concern over the fact that I (Chief) disrespected her in front of the other officers and civilians who were present.  She stated I purposely accused her of being the cause of a complicated program report called e-CallResponse and continued to not listen to her.  During our conversation that lasted more than 2 hours, Melinda expressed "victim" type feelings with respect to the way other officers treat her and went back years ago citing incidents that I (Chief) have no knowledge of.

### 10.  RECOMMENDATIONS AND ADVICE OF COUNSELOR:

My inquiries of other officers present confirmed my impression of the exchange on December 4th to have been nothing more than a difference of opinion and I in no way accused Melinda of anything.

Melinda has been under extreme stress these past months working on Christmas in Alexandria and I have witnessed other such outbursts with members of our business community on the phone with her.  It is my opinion that Melinda needs to seek help through our Employee Assistance Program (EAP) for stress management.

I have no reason to believe Melinda would lie to me or otherwise make up a story.  Thus, the drastic difference in perceptions between what she believes happened and what others and I perceived, is why EAP is a good option.

(Docs. # 31 at 139-40; 31-1 at 29).

In the "Command Officer's Comments" section, Chief Ward incorporated the following language from APD's policy manual:

Under the Policy & Procedures of the Police Department, Chapter 12, page 12-10 "Referral to Employee Assistance Program" I am making a Supervisory Referral to EAP.  I am concerned about Melinda and as not to cause her any loss of work time or out of pocket expense, she is authorized to attend any and all sessions as required by the counselor on work time and all co-pays will be covered by the Police Department.

Although Melinda has the right to choose not to seek counseling, failure to comply with this request may indicate she is unwilling to see available avenues to improve her job-related performance, further disciplinary action may result.

All information discussed with the EAP counselor shall be confidential as required by law.  This agency shall not receive or attempt to receive confidential information from EAP.  However, the department's appropriate

7

supervisor may confirm the member's attendance as appropriate.

(Doc. # 33 at 144-45).

Chief Ward "wanted to make sure that, in making the referral to EAP, that I was lockstep with the way the – we should do it," so he consulted city clerk and *de facto* human resources manager Karen Barto ("Barto"). (*Id.* at 140). On December 7, 2012, Chief Ward invited Grizzell and Barto into his office, then presented her with the ROC. (Doc. # 33 at 144-45). Chief Ward testified that he told Grizzell the ROC would not remain in her file once she completed EAP. (*Id.* at 155-56). He left Barto with Grizzell when she allegedly began "screaming and yelling at me" and "accus[ing] me of things that I had no idea what she was talking about." (*Id.*). Grizzell then signed the ROC to indicate that she had received it, but noted that she was too upset to read it. (Doc. # 31-1 at 30). Per Chief Ward's instructions, Barto authorized Grizzell to go home early. (*Id.* at 155).

While ROCs are sometimes issued for positive reasons, Grizzell believed it was a punitive measure because ROCs are listed under "Disciplinary Measures" in the APD policy manual. (Doc. # 31 at 113, 117). She felt that she was being singled out as a problem employee because the ROC "is leading to something else. It's not the end of it. They could keep it and hold it against you." (*Id.*). According to Grizzell, Chief Ward threatened to further investigate and reprimand her for non-compliance with EAP. (*Id.* at 120). She further explained that Chief Ward can "use this as retaliation, and he knows he has the authority to do this. And he made the remark he's taking steps to cover himself . . . So th[ese are] the steps he's taking to get me fired." (*Id.* at 117).

That afternoon, Grizzell prepared to file a grievance. (*Id.* at 130-31). Based upon her review of City and APD policies, she concluded that she had to complain to Mayor

8

Rachford or the City Administrator.  (*Id.*).  Because the City had no City Administrator, Grizzell delivered her Notice of Grievance directly to Mayor Rachford. (Doc. # 30 at 130). She described Chief Ward's inappropriate comments, disrespectful attitude at the December 4th meeting and referral to EAP.  (Doc. # 30 at 116, 119, 124-25).  Mayor Rachford testified that Chief Ward had told him about these events at a council meeting the previous evening, so he asked Chief Ward to join them upstairs and discuss the conflict further.  (Doc. # 30 at 123).  Chief Ward declined the invitation.  (Doc. # 33 at 156).  During their meeting, Mayor Rachford suggested that Grizzell consult her doctor about the effect of recent medication changes on her mood.  (*Id.*).  She seemed receptive to the idea and indicated that she would attend counseling if Chief Ward agreed to do so as well.  (*Id.*).

The next day, a Saturday, Chief Ward called Grizzell's house.  (Doc. # 33 at 164). Her mother answered the phone.  (*Id.*).  According to Chief Ward, he told Grizzell's mother that he was calling to check on her daughter, and she responded that he was the cause of her daughter's stress.  (*Id.*).  Grizzell's mother testified that Chief Ward told her the stress of CIA was affecting her daughter's mind.  (Doc. # 34 at 7).

Grizzell and her brother crossed paths with Chief Ward at CIA that night.  (Doc. # 31 at 140).  He again asked if she was alright, to which she replied, "What do you think?" (*Id.*).  He promised that they would speak later and walked away.  (*Id.*).  At her deposition, Grizzell explained that her brother accompanied her that night because her family feared that APD personnel would retaliate against her, as they had done during the previous EEOC investigation.  (*Id.* at 141).  She denied being afraid, but admitted that her brother's presence was comforting.  (*Id.*).

9

On December 10, 2012, both Grizzell and Chief Ward informed Mayor Rachford of the phone conversation that took place over the weekend.  (Doc. # 30 at 134).  Grizzell's letter indicates that she was actually quite apprehensive:

> This letter is to notify you of my fears.  Due to how [Chief Ward] acted Friday, I am in fear he will use Casey's Law[2] to arrest me.  I am in fear of my job, I am in fear of meeting with him one-on-one or any meeting with him, Lt. Col. Alexander and Lt. Schreiner.  I am in fear of attending staff meetings.  I am in fear of further retaliation.  Every time I have had to stand up for my rights against an officer, retaliation occurs to the point of personal threats, sabotage to my desk, visits to my home and following of family members.

(Doc. # 31-1 at 35).  She then expressed her intent to file another EEOC Charge.  (*Id.*).  Grizzell also reported that she had taken Mayor Rachford's advice and made an appointment with her doctor, who was satisfied with her perception and outlook.  (*Id.* at 133; Doc. # 31 at 140).

On December 14, 2012, Mayor Rachford asked Grizzell and Chief Ward to utilize the Kentucky League of Cities' arbitration process.[3]  (144; Doc. # 31-1 at 36).  When both parties consented, Barto began arranging the mediation.  (*Id.*; Doc. # 30 at 235).  Just six days later, Grizzell notified Mayor Rachford that she had changed her mind about mediation because she did not want to sign a confidentiality agreement.  (Doc. # 31-1 at 37).  She demanded that Chief Ward destroy her ROC, schedule an organizational effectiveness and gender communications workshop for APD and restore her credibility

---

2) Casey's Law is codified at KRS § 222.430-222.437.  It creates a mechanism for involuntary treatment for a person suffering from alcohol and drug abuse.  *See also* http://caseyslaw.org/.

3) According to Mayor Rachford, the Kentucky League of Cities ("KLC") is "an association of cities within the Commonwealth of Kentucky."  (Doc. # 30 at 39).  He further explained that they help municipalities with, *inter alia*, risk management, employee benefits and legal representation.  (*Id.*).  This is consistent with the information provided on the KLC website.  *See* http://www.klc.org/.

with co-workers.  (*Id.*).  She warned that "anything short of this will result in me going further."  (*Id.*).  Chief Ward agreed to arrange a training seminar, but explained that the ROC would not be removed from her file until she completed EAP:

> In keeping with our years of practice where Records of Counseling (ROC) are concerned, none are made permanent records so long as the issues addressed in the counseling form are corrected.  In this particular case, you were directed to go to EAP for stress management counseling.  Once that was accomplished–if only for one visit, the ROC would be removed from your file.  The ball still remains in our court so to speak.

(Doc. # 31-1 at 39).

On January 2, 2013, Mayor Rachford, Chief Ward, Grizzell and Barto formulated the following conflict resolution plan:

> 1.  Require that both Melinda and Mike attend EAP counseling sessions offered through out employee benefit program for stress management.  They are to submit the necessary paperwork to initial these sessions by close of business on Monday, January 7, 2013.
>
> 2.  Require that all city employees attend a workshop on Organizational Effectiveness and/or Sexual Harassment/Proper Gender Communications.  Karen is to set this up through an appropriate source.
>
> 3.  Require that both Melinda and Mike participate in mediation sessions using an impartial third party mediator thru [sic] the KLC.

(Doc. # 31-1 at 38).

Grizzell and Chief Ward attended individual counseling sessions the next day.  (Doc. # 31-1 at 41; 26 at 58).  Grizzell's counselor wanted her to attend one more session so she could ensure that Grizzell was not just having a "good mood day."  (Doc. # 31 at 174). Grizzell initially agreed, but later cancelled her follow-up appointment.  (*Id.*).  On January 7, 2013, she informed Mayor Rachford that she had attended one counseling session and would not be going to any more of them.  (Doc. # 31-1 at 41).

11

Grizzell was supposed to receive her quarterly evaluation the next day, but Ltc. Alexander left several sections blank:

> I have not completed certain sections of this report (page 1-performance factors) due to recent events involving this employee and anything I say, suggest or recommend is only going to be misconstrued, misunderstood, and probably will result in an attempt to be used against me somehow.  I will do so on her next quarterly evaluation due on or about April 1st–hopefully issues will be resolved by then.  If not, I will be more than happy to complete this evaluation along with my comments.

(Doc. # 31-1 at 44).  Grizzell told Chief Ward that she was "very disappointed and feel further harmed by my supervisor not completing my evaluation . . . because he feels I 'will use it against him somehow.'" (*Id.* at 45).  That afternoon, Grizzell responded to an unrelated email thread about possible changes to APD's Crisis Intervention Team.  (*Id.* at 3-4).  Chief Ward instructed Ltc. Alexander and Officer Selby not to respond to her suggestions without speaking to him first.  (*Id.*).

Mediation took place on January 11, 2013.  (Doc. # 33 at 86).  Although Grizzell did not testify about the mediation, she described the session in an email to Mayor Rachford as follows: "For the record, the mediator ended the negotiations.  He slammed his book shut, said thank you for your time, picked up his and your notebooks and left the room." (Doc. # 30 at 241).  She further stated that "Chief Ward had no other intention during the mediation than to be cruel."  (*Id.*).

Chief Ward testified that Grizzell spoke first.  (*Id.*).  The mediator admonished him for interrupting her once.  (*Id.*). When it was Chief Ward's turn to speak, Grizzell allegedly interrupted him three times, prompting the mediator to chastise her.  (*Id.*).  Grizzell allegedly "slammed her books, said she was done, said that she was going to sue us and that this was over."  (*Id.* at 86-87).  According to Chief Ward, the mediator followed Grizzell

12

and tried to calm her, but he finally returned to the room and indicated that she had walked out.  (*Id.* at 87).

At Mayor Rachford's request, Ltc. Alexander completed Grizzell's evaluation.  (Doc. # 26-6 at 3-6).  While "[t]here is no question that you know what your job is and you do it very well," Ltc. Alexander thought that her leadership skills, professional qualities and judgment needed improvement, as "the current dispute you are having with this department and the chief of police [ ] does not foster teamwork."  (*Id.*).  He further explained that her dispute with Chief Ward caused "an uneasy feeling within the department and its members. Everybody is reluctant to say or do anything around you, or even speak with you directly out of fear that you will get upset, or accuse them of saying something personally attacking or demeaning you."  (Doc. # 26-6).  Grizzell complained to Mayor Rachford that these comments were "nothing but hostile, rambling, beyond the rating period, judged on recent dispute, defiant and subjective."  (Doc. # 30 at 242).

On January 18, 2013, the EAP counselor informed Chief Ward that Grizzell "cancelled her second appointment and is unwilling to continue with the process. Therefore, she is considered non-compliant and I will close her case as of this date."  (Doc. # 31-1 at 42).  Grizzell testified that she thought she only had to attend one session, based on the wording of Chief Ward's December 20, 2012 email.  (Doc. # 31 at 168-69).  At his deposition, Chief Ward admitted that the email's wording was confusing.  (Doc. # 33 at 156-57; Doc. # 33-1 at 39).  He meant that Grizzell needed to attend counseling, even if the therapist ultimately determined that one session was sufficient.  (*Id.*).

That same day, Barto announced that all APD personnel had to attend a mandatory training seminar called "Understanding Legal Issues in the Workplace."  (Doc. # 33-1 at 6).

13

Morscher testified that other employees were upset because they had to "take the time to
do this." (Doc. # 32 at 17).  Chief Ward similarly testified that he thought employees were
upset about the training and knew that it was one of Grizzell's demands.  (Doc. # 33 at 82).
According to Grizzell, Chief Ward made this knowledge public.  (Doc. # 31 at 192-93).  He
maintains that Grizzell publicized this information by making comments to Childers and
Morscher.  (Doc. # 33 at 78, 83).

On January 31, 2013, the training seminar took place.  (Doc. # 29 at 107).  Barto
testified that some of the attendees asked questions that seemed to be indirectly aimed at
Grizzell.  (*Id.* at 88).  Grizzell had a similar impression.  (Doc. # 31 at 193-94).  At her
deposition, she testified that Officers Wince and Selby made comments that seemed to be
directed at her, although they did not mention her by name.  (*Id.*).

After the training ended, several employees gathered in Chief Ward's office.  (Doc.
# 31 at 195-97).  Although Grizzell could not hear what they were talking about, she
thought they seemed upset about something.  (*Id.*).  As one officer passed by, Grizzell
asked him if those employees were getting "revved up," but he did not respond.  (*Id.*).
Around the same time, she saw Lt. Schreiner slam a Coke can into the recycling bin in what
seemed to be an angry manner.  (*Id.*).  Grizzell called Barto and asked her to come
downstairs so she could calm everyone down.  (Doc. # 29 at 113-14).  Barto refused
because she was about to leave the office, even after Grizzell allegedly expressed fear for
her safety.  (*Id.*; Doc. # 29 at 113-14).  Grizzell then allegedly referred to the past EEOC
complaint and told Barto that she got a call from Mike's wife, Carol, saying that he was
going to hurt her.  (*Id.* ; Doc. # 31 at 150, 200-01).  Barto testified that Grizzell mentioned
Carol Ward, but Grizzell insists that she was referring to Officer Welch's wife, not Mike

14

Ward's wife.  (Docs. # 29 at 104; 31 at 200-01).

On February 1, 2013, Mayor Rachford placed Grizzell on paid administrative leave until she provided certification from a qualified mental health professional that she was fit to return to work.  (Doc. # 33-1 at 10).  He offered the following rationale in support of his decision:

> Your recent actions have given me concern with respect to your health and well-being.  Yesterday you repeatedly expressed a concern for your safety at work to me and other City employees.  In particular, you have expressed such a concern that other City employees may physically harm you.  I take such allegations seriously and immediately followed up and spoke with the individuals with whom you felt threatened.  However, at this time I have found nothing that would substantiate your claims or provide a reasonable basis for you to feel threatened at work. . . [T]his action is being made solely out of concern for your personal well-being and is in no way a punishment for reporting your concerns.

(*Id.*).  On February 13, 2013, Grizzell met with Dr. Steven I. Durkee ("Dr. Durkee"), who found "no clinical evidence that would warrant [Grizzell] to be considered of harm to herself or to others at this time" or cause him "to believe that she could not perform the normal duties of her profession at this time."  (Doc. # 33-1 at 12).

APD retained Adams, Stepner, Woltermann and Dusing ("ASWD") to investigate Grizzell's allegations.  (Doc. # 30 at 244).  ASWD reported that it was "not able to find anyone who could corroborate or confirm [Grizzell's] account.  In fact, they refuted it." (Doc. # 26-9).  When ASWD communicated these findings to Grizzell's attorney and offered her "an opportunity to propose some remedial steps that address the Mayor's concerns," Grizzell's attorney responded that their offer "may leave us no alternative but to pursue both a claim with the Equal Employment Opportunity Commission, as well as a civil law suit of defamation and intentional infliction of emotional distress."  (Doc. # 26-10).

15

On February 27, 2013, Mayor Rachford terminated Grizzell's employment.  (Doc. # 30 at 250).  He explained that she was "placed on paid administrative leave because you made unsubstantiated allegations that Chief Ward was going to physically harm you" and because her behavior had a detrimental effect on the work environment at APD:

> Considering all relevant circumstances, it has become clear to me that your recent behavior is causing significant stress and anxiety amongst the Department staff and personnel.  This, of course, hinders productivity and the performance of our service to the public.  It has also become clear that many of the employees no longer feel comfortable working with you for fear that they will be subject to an unsubstantiated allegation of impropriety.

(*Id.*).  Because the subsequent investigation "failed to identify any evidence to corroborate your claims [of sexual harassment and retaliation]," and because Grizzell "refused to propose any solutions or even acknowledge that these legitimate and serious issues exist," Mayor Rachford concluded that he had "no choice but to terminate your employment with the City effective immediately."  (*Id.*).

On March 21, 2013, Grizzell filed an EEOC Charge of Discrimination.  (Doc. # 26-12).  Almost a year later, the EEOC entered its Dismissal and Notice of Rights, indicating that the "issues will be decided in a court of competent jurisdiction."  (Doc. # 26-13).  Grizzell filed this action in federal court shortly thereafter.  (Doc. # 1).  After discovery had closed, Grizzell filed her Motion for Partial Summary Judgment (Doc. # 25) as to liability and the Alexandria Defendants filed their Motion for Summary Judgment (Doc. # 26).  Both Motions are now ripe for the Court's review.  (Docs. # 27, 28, 35 and 36).

III.   **Analysis**

A.   ***Standard of Review***

Summary judgment is appropriate when there is no genuine dispute as to any

16

material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

### B.    Threshold Considerations

#### 1.    Claims against APD

Grizzell's Amended Complaint states Title VII and ADA claims against APD. (Doc. # 10 at 10-11).  In their Motion for Summary Judgment, the Alexandria Defendants argue that APD should be dismissed from this action because, as a sub-unit of the City, it is not an entity capable of being sued.  (Doc. # 26 at 27-28).  Grizzell conceded this point in her Response.  (Doc. # 27-1 at 21).

Having reviewed the relevant case law, the Court agrees with both parties.  Because APD is not an entity *sui juris*, it must be dismissed as a Defendant in this action.  *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (stating in the § 1983 context that a local police department was not an entity which could be sued); *Rodgers v. City of Cleveland*, No. 1:05-CV-2349, 2006 WL 2371981, at *1, n. 1 (N.D. Ohio Aug. 15, 2006)

17

(applying this principle in the Title VII context); *Jones v. Marcum*, 197 F. Supp. 2d 991, 997 (S.D. Ohio 2002) ("Police departments are not *sui juris*; they are merely sub-units of the municipalities they serve.").

### 2.   Claims against Mayor Rachford and Chief Ward

Grizzell also asserts Title VII and ADA claims against Mayor Rachford and Chief Ward.  (Doc. # 10 at 10-11).  Although the Amended Complaint does not explicitly state whether Grizzell sought to sue these Defendants in their individual capacities, official capacities or both, the nature of the claims asserted therein led the Court to believe that Grizzell was proceeding against them in both capacities.  (Docs. # 1, 10).  Grizzell confirmed this in her Response to the Alexandria Defendants' Motion for Summary Judgment, stating that "the proper Defendants are Michael Ward, both individually and in his capacity as police chief; William Rachford, both individually and in his capacity as mayor; and the City of Alexandria."  (Doc. # 27-1 at 21).

### a.   *Individual Capacity*

Pursuant to Title VII of the Civil Rights Act of 1964, an employer may not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  An "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person."  42 U.S.C. § 2000e(b).

18

"[A] narrow, literal reading of the agent clause in §2000e(b) does imply that an employer's agent is a statutory employer for purposes of liability." *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (1997) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995)).   Nevertheless, the Sixth Circuit has held that "supervisors, sued in their individual capacities, are not included within the statutory definition of 'employer' under Title VII and its sister civil rights statutes, and accordingly cannot be held personally liable for discrimination." *Hiler v. Brown*, 117 F.3d 542, 546 (6th Cir. 1999).  This principle has also been applied in the ADA context.  *See Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 808 n.1 (6th Cir. 1999) ("Individual supervisors who do not independently qualify under the statutory definition of employers may not be held personally liable in ADA cases.").

Both parties have based their respective analyses on the premise that Mayor Rachford and Chief Ward are supervisors within the City government.  (Docs. # 10, 25 and 26).  The Court finds this to be a reasonable conclusion, given their positions of authority over other City employees.  After all, Mayor Rachford supervises the City Clerk, Zoning Administrator, Supervisor of Public Works and Community Center Manager.  (Doc. # 30 at 32).  He also serves as Chief Ward's superior.  (*Id.*).  Chief Ward, in turn, oversees all sworn and civilian employees within APD.  (Doc. # 33 at 112-13).  However, the City itself is the actual *employer* for all individuals working within the local government, up to and including Chief Ward and Mayor Rachford.  Because Mayor Rachford and Chief Ward do not independently qualify under the statutory definition of employer, Grizzell's Title VII and ADA claims against them in their individual capacities must be dismissed.

### b.    Official Capacity

The Sixth Circuit has yet to issue an explicit ruling with respect to official capacity

suits against supervisors under Title VII.  *Suiter v. Logan Cnty., Ky.*, Civ. A. No. 1:12-CV-00155-GNS-HBB, 2015 WL 1405508, at *11 (W.D. Ky. Mar. 26, 2015); *Campbell v. Korleski*, No. 2:10-CV-1129, 2011 WL 2748641, at *4-5 (S.D. Ohio July 14, 2011).  In *Little v. BP Exploration & Oil Co.*, the court explained:

> there is support for the proposition that a supervisor may be held liable [under Title VII] in his or her official capacity upon a showing that he or she could be considered the "alter ego" of the employer.  This Court has not clearly and definitively ruled on this issue and we need not do so today.  Under the standards set forth in other circuits that allow supervisors to be sued in their official capacity, Plaintiff has failed to make a showing that [the supervisor] had significant control over Plaintiff's hiring, firing and working conditions such that he could be considered the "alter ego" of BP.

265 F.3d 357, 362 n. 2 (6th Cir. 2001).  Since *Little*, "[s]ome district courts within the Sixth Circuit have discussed this issue, but ultimately conclude that allowing an official capacity suit against a Defendant is redundant when the employer is already a named defendant." *Suiter v. Logan Cnty., Ky.*, Civ. A. No. 1:12-CV-155-GNS-HBB, 2015 WL 1405508, at *11 (W.D. Ky. Mar. 26, 2015) (citing *Maudlin v. Inside Out Inc.*, No. 3:13-CV-00354-TMR, 2014 WL 1342883, at *4 (W.D. Ohio Apr. 3, 2014)).  After all, "[a] suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the municipal entity." *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

District courts within the Sixth Circuit have taken a similar approach with respect to ADA claims against individuals in their official capacities.  Although "[a]n ADA [ ] suit may be brought against a public entity by naming the entity itself or by suing an agent of an entity in his official capacity," such suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Moore v. Tanner*, Civ. A. No. 07-CV-10442, 2008 WL 3876346, at *6 (E.D. Mich. Aug. 18, 2008) (quoting *Monell v. New*

*York City Dept. Of Soc. Servs.*, 436 U.S. 658, 690 n. 55 ((1978)); *see also Norris v. Marrero*, Civ. A. No. 5:14-234-DCR, 2014 WL 7366224, at *5 (E.D. Ky. Dec. 24, 2014).

In this case, the Court will *assume*, without deciding, that Grizzell's Title VII and ADA claims against Mayor Rachford and Chief Ward in their official capacities are cognizable in the Sixth Circuit.  However, Grizzell has already asserted identical claims against the City itself, so the Court will follow *Logan Cnty's* approach and treat Grizzell's federal claims in all respects as claims against the City.  Thus, the following substantive analysis of those claims applies with equal force to her presumed claims against Mayor Rachford and Chief Ward in their official capacities.

## C.  *Grizzell's Federal Claims Against the City*

### 1.    **Title VII Hostile Work Environment**[4]

Despite its broad language, "Title VII does not prohibit all verbal or physical harassment in the workplace."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (stating that Title VII is not meant to eradicate the "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex).  Rather, "it is directed only at '*discriminat[ion]* . . . because of . . . sex.'"  *Id.*   The key inquiry is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are

---

4) Grizzell's Amended Complaint states a claim for violations of Title VII and "the Fair Employment Practices Act under KRS 344.010 et seq."  (Doc. # 10, p. 10, ¶ 54).  Grizzell presumably refers to the Kentucky Civil Rights Act, codified at KRS § 344.010 *et seq.*, which provides similar protections as Title VII.  *See Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005).  "A sexual harassment claim brought under the Kentucky Civil Rights Act ("KCRA") is to be analyzed in the same manner as a claim brought under Title VII, its federal counterpart."  *Id.* (citing *Ammerman v. Bd. of Ed. of Nicholas Cnty.*, 30 S.W.3d 793, 797-98 (Ky. 2000)).  The Court will consolidate its analysis accordingly.

not exposed." *Id.* (internal citations omitted).

"A plaintiff may establish a violation of Title VII by proving that the sex discrimination created a hostile or abusive work environment without having to prove a tangible employment action." *Bowman v. Shawnee St. Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). To succeed on such a claim, the plaintiff must establish that (1) the employee belonged to a protected class; (2) the employee was subject to unwelcome harassment; (3) the harassment was based on the employee's sex; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562-63 (6th Cir. 1999).[5]

To determine whether harassing conduct is so severe or pervasive as to create a hostile work environment, courts must consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 814. "Under this totality-of circumstances[6] test, 'the issue is not whether each

---

5) An employer's liability for harassment under Title VII may depend on whether the harasser is the victim's co-worker or supervisor. *Vance v. Ball St. Univ.*, 133 S. Ct. 2434, 2439 (2013). However, "district courts must not conduct separate analyses based on the identity of the harasser unless and until considering employer liability." *Id.* (further stating that "the totality of the circumstances, of necessity, includes all incidents of alleged harassment"). Although the Court earlier noted that Mayor Rachford and Chief Ward are supervisors, the distinction is immaterial to the Court's analysis of this claim because Grizzell has not demonstrated that the offensive conduct was severe enough to alter the conditions of employment.

6) Courts characterize this test as having both objective and subjective components. *Bowman*, 220 F.3d at 463. The objective component was essentially the totality of the circumstances test. *Id.* The subjective component requires that "the victim must subjectively regard the environment as abusive." *Id.* By virtue of the fact that the victim is bringing such a claim, one can infer that he or she regarded the environment as abusive, which perhaps explains why courts focus heavily on the objective aspect. *See Waldo*, 726 F.3d at 814. In this case, Grizzell testified that she "cringed" at some of Chief Ward's comments and found them to be inappropriate, but admitted that some of his statements did not cause "measurable harm" and were not so offensive that she felt she needed

incident of harassment standing alone is sufficient to sustain the cause of action in a hostile work environment case, but whether–taken together–the reported incidents make out such a case.'" *Id.* (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999)); *see also Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (stating that isolated incidents will not satisfy the objective part of the test unless they are extremely serious).

This test "ensure[s] that Title VII does not become a 'general civility code'" and, if implemented effectively, "filter[s] out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Courts applying the totality of the circumstances test have been much more likely to find that there was a hostile work environment when the employee suffered continual and physically invasive harassment. *Compare Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (finding that there was a hostile work environment where co-worker repeatedly requested oral sex from plaintiff and rubbed against her with his private parts while working on production line) *and Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563-64 (6th Cir. 1999) (concluding that plaintiff had made a prima facie showing of hostile work environment where she was subjected to continual sexual propositions, derogatory remarks about women and physical pranks, such as being hit by a thrown box and locked in her work area) *with Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351 (6th Cir. 2005) (finding no hostile work environment when male supervisor told vulgar jokes, twice pressed vibrating

to do something. (Doc. # 31 at 72-76).

pager against plaintiff's thigh, and once pulled at her overalls when she said she was wearing a thong) *and Stacy v. Shoney's, Inc.*, 142 F.3d 436 (6th Cir. 1998) (table) (finding that plaintiff had not established a hostile work environment when male supervisor regularly made sexual comments and touched plaintiff's breast once while removing a pen from her shirt pocket).

Grizzell alleges that Chief Ward created a hostile work environment with the following actions: (1) telling female employees the story about the topless women in the boat; (2) detailing a former co-worker's sexual proclivities in front of female employees; (3) referring to City Clerk Karen Barto as a "fucking bitch;" (4) observing that men were better than women because women always wanted to talk things out, while men would fight things out; and (5) displaying an image of Hillary Clinton with what appeared to be a bullet hole through her forehead in his office.  (Docs. # 25 at 11; 31-1 at 37).  Although Grizzell did not complain about these comments at the time they were made, Chief Ward's behavior at the December 4th meeting "pushed her to the point where she could no longer remain silent about the hostility she felt and the effect it was having on her work."  (*Id.*).

The Alexandria Defendants insist that "[n]one of these comments, taken individually or as a whole, are severe or pervasive enough to create a sexually hostile work environment as a matter of law."  (Doc. # 26 at 11).  In support of this assertion, the Alexandria Defendants point out that Chief Ward never made sexual advances towards Grizzell or touched her inappropriately.  (*Id.* at 13).  They maintain that Chief Ward did nothing more than tell a handful of risque stories and inappropriate jokes over a ten year period.  (*Id.*).  The Alexandria Defendants also find it telling that Grizzell decided to complain about Chief Ward's comments, some of which were years-old, shortly after he

24

disrespected her in front of guests.  (*Id.* at 14).

While there is some disagreement as to what Chief Ward actually said during some of these conversations, it does not impact the Court's analysis.  Accepting Grizzell's entire version of events, Chief Ward's alleged conduct is not severe enough, under the totality of the circumstances, to alter the conditions of employment.  Grizzell failed to establish that Chief Ward made such comments frequently.  Although she testified that he made generalizations about men and women on a monthly basis for about two years, she was unable to recall when or how often she heard the other statements.  (Doc. # 31 at 72-76).  She could only state that she was present when Chief Ward told two inappropriate stories and joked about feminine hygiene products with Lt. Schreiner.  (*Id.* at 51-53, 72-76, 90-93).  In short, she has established that Chief Ward made a few inappropriate comments and told some risque stories over a *ten year* period.

Moreover, there is no evidence that Chief Ward ever touched Grizzell inappropriately or made sexual advances towards her; his inappropriate conduct consists solely of comments made in Grizzell's presence.  While his comments may have been of a questionable nature, they were not particularly severe, nor did they unreasonably interfere with Grizzell's work.  Morscher testified that Chef Ward's story about the topless women sounded inappropriate in the abstract, but was not offensive in the context of their conversation.  (Doc. # 32 at 10-11).  Even Grizzell admitted that Chief Ward's sexist generalizations "w[ere]n't so offensive that I felt I needed to do something about it."  (Doc. # 31 at 72).  Likewise, his conversation with Lt. Schreiner about feminine hygiene products, although embarrassing and unpleasant, did not cause her "measurable harm."  (*Id.* at 80).  Although Grizzell asked Chief Ward and Lt. Schreiner to cease their conversation on that

25

occasion, she never filed a grievance about Chief Ward's other comments. (*Id.*). When asked why she did not take such action, Grizzell testified that she tried to work around these comments. (*Id.* at 72-76).

Stated simply, this case is one that the totality of the circumstances test is meant to filter out. Grizzell has, at best, established that Chief Ward sporadically used abusive language and made gender-related jokes. While he may have been unwise in his choice of anecdotes, such poor decision-making is not actionable under Title VII. To allow Grizzell's claim to move forward would essentially turn Title VII into a "general civility code," contrary to its intended purpose. For these reasons, the Alexandria Defendants are entitled to summary judgment on Grizzell's Title VII hostile work environment claim.

### 2.    Retaliation in Violation of Title VII

Title VII prohibits an employer from "discriminat[ing] against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). This provision is intended "to prevent employer interference with unfettered access to Title VII's remedial mechanisms." *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 55 (2006).

When a plaintiff proffers circumstantial evidence to support a claim of retaliation, courts must apply the *McDonnell Douglas* burden-shifting framework. *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* Upon such a showing,

26

the burden then shifts back to the plaintiff to "demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Id.* at 544.

A prima facie case of Title VII retaliation is composed of the following elements: (1) the plaintiff engaged in a protected activity; (2) the exercise of protected civil rights was known to the defendant; (3) the defendant thereafter took adverse employment action towards the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.* "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013)).

Grizzell argues that she has established a prima facie case of Title VII retaliation because she confronted Chief Ward about his inappropriate comments, only to be questioned about her mental health, ordered to attend therapy and terminated from employment shortly thereafter. (Doc. # 25 at 12). As for the required causal connection, Grizzell states simply that her "actions undoubtedly have a connection. It is clear had the Plaintiff never addressed her concerns she would not have had an EAP requirement placed in her file and ultimately been terminated." (*Id.*).

The Alexandria Defendants maintain that Grizzell "cannot prove that her alleged complaint of inappropriate statements to Chief Ward on December 5, 2012 was the but-for cause of her termination." (Doc. # 26 at 15). Instead, they contend that she was terminated solely due to her disruptive behavior, which created a discordant atmosphere

27

in APD and made her co-workers uncomfortable working with her.  (*Id.*).  Grizzell responds that they have failed to identify any disruptive behavior on her part.  (Doc. # 27-1 at 13). She insists that Chief Ward created the tense office environment by investigating her complaints himself, rather than recruiting a neutral third party for the task.  (*Id.*).

The record reflects that Grizzell and Chief Ward had a disagreement during an open meeting on December 4, 2012.  (Docs. # 31 at 53-55; 33 at 121-22).  Each of them felt that they had been disrespected by the other.  (*Id.*).  When they tried to discuss the issue the next day, their tempers flamed again.  (Docs. # 31 at 70-71; 33 at 97-98).  Grizzell then confronted Chief Ward about his inappropriate comments, later testifying that his behavior at the December 4th meeting was the "straw that broke the camel's back."  (Doc. # 31 at 70-71).  On December 7th, Chief Ward presented Grizzell with an ROC and referred her to counseling through EAP.  (*Id.*).  Grizzell complained to Mayor Rachford, which caused the dispute to escalate.  (Doc. # 31 at 139-40).  Thus, Grizzell has satisfied the first three elements of the retaliation test.

However, Grizzell has not demonstrated that her complaints about Chief Ward's comments were the but-for cause of her referral to therapy.  Grizzell voiced her concerns about Chief Ward's gender-based comments on December 5th.  At that time, the two were heatedly discussing the reciprocal disrespect exhibited at the previous day's meeting. Chief Ward testified that her behavior on both occasions was out of character for her, so he referred her to EAP.  (Doc. # 33 at 102, 130).  If Grizzell had only confronted Chief Ward about his gender-based comments, then received the EAP referral, this would be a much easier case.  But because the December 4th meeting played a role in Chief Ward's decision, the record simply does not allow a reasonable juror to find that her complaints

28

were the but-for cause of her referral.

Likewise, Grizzell has failed to establish that her complaints were the but-for cause of her administrative leave and termination.  Mayor Rachford testified that he placed Grizzell on leave and terminated her employment  due to disruptive behavior.  (Doc. # 30 at 250).  Although Grizzell insists that her behavior was not disruptive, the record reflects that some of her co-workers became uncomfortable working with her.  (Docs. # 31-1 at 44; 33 at 82).  If Mayor Rachford had received Grizzell's complaints, then terminated her employment for disruptive behavior, contrary to co-workers' testimony that they worked well with her, then this would be an easier case.  But because there is evidence that her behavior was a concern to other employees, and that this factored into Mayor Rachford's decision to terminate her employment, the record simply does not allow a reasonable juror to find that her complaints were the but-for cause of her referral.

Stated simply, Grizzell has not only failed to establish a prima facie case of Title VII retaliation, she has failed to show that there is a genuine issue of material fact to preclude this Court from granting the Alexandria Defendants' Motion for Summary Judgment. Grizzell attempts to blame the office tension on Chief Ward, who asked other supervisors about his behavior at the December 4th meeting, inquired whether he made female employees uncomfortable and asked some of those individuals to report unusual behavior from Grizzell.  However, nothing in the record suggests that these inquiries affected other employees' attitude towards Grizzell.  Because Grizzell has not demonstrated that there is a genuine issue of material fact as to whether her complaints about Chief Ward were the but-for cause of her EAP referral, leave and termination, the Alexandria Defendants are entitled to summary judgment on this claim.

29

### 3.    Disability Discrimination in Violation of the ADA[7]

As the Court has already noted, Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Because direct evidence of discriminatory treatment is usually unavailable, the law allows plaintiffs to present indirect evidence of discrimination using the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green. See* 411 U.S. 792, (1973); *see also Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998).  If the plaintiff states a prima facie case of disability discrimination, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse action.  *Id.* Once the defendant proffers such a reason, the burden shifts back to the plaintiff to show that it is a pretext for discrimination.  *Id.*

#### a.    *Prima facie case*

A prima facie case of disability discrimination in violation of the ADA consists of the following five elements: (1) the plaintiff is disabled; (2) the plaintiff is otherwise qualified to perform the essential functions of the position, with or without reasonable accommodation; (3) the plaintiff suffered an adverse employment action because of his or her disability; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position

---

7) Grizzell also states a claim for violations of the Americans with Disabilities Act and the Kentucky Civil Rights Act.  Because the Kentucky Civil Rights Act mirrors the Americans with Disabilities Act, the Court will again use the federal framework to analyze both claims.  *Compare* 42 U.S.C. § 12112 *with* Ky. Rev. Stat. Ann. § 344.010, et seq.; *see Bryson v. Regis Corp.*, 498 F.3d 561, 754 (6th Cir. 2007); *Hallahan v. Courier-Journal,* 138 S.W.3d 699, 706-07 (Ky. Ct. App. 2004).

remained open while the employer sought other applicants or the disabled individual was replaced.  *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).  The Alexandria Defendants attack only one aspect of Grizzell's prima facie case–whether or not she was "regarded as" disabled.

The ADA Amendments Act of 2008 ("ADAAA")[8] construes "the definition of 'disability' . . . broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA."  29 C.F.R. § 1630.1(c)(4).  Accordingly, an individual is "disabled" if they satisfy one of the following criteria:

> (A)     a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B)     a record of such an impairment; or
>
> (C)     being regarded as having such an impairment as described in paragraph (I) of this section.

29 C.F.R. § 1630.2(g)(1); *see also* 29 C.F.R. § 1630.2(g)(2) (stating that "[a]n individual may establish coverage under any one or more of these three prongs of the definition of disability").  "The question of whether an individual meets the definition of disability under this part should not demand extensive analysis."  29 C.F.R. § 1630.1(c)(4).

"[A]n individual is 'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity."  29 C.F.R. § 1630.2(l)(1).  Prohibited actions include

---

8) The ADAAA's primary purpose is "to make it easier for people with disabilities to obtain protection under the ADA."  29 C.F.R. § 1630.1(c)(4).

"but are not limited to refusal to hire, demotion, placement on voluntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment."  *Id.*

Grizzell insists that the Alexandria Defendants "regarded her" as being disabled.  In support of this proposition, she points out that Chief Ward referred her to counseling for stress management, which ultimately led to her administrative leave and termination.  (Doc. # 27-1 at 14-15).  The Alexandria Defendants contend that they had a right to refer Grizzell to counseling in order to figure out the cause of her behavior.  (Doc. # 26 at 18-19).  They further note "an employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." (*Id.*).  Grizzell responds that such a right only exists when the employee's condition affects their ability to perform essential job functions, which was not the case here.  (Doc. # 27-1 at 15).

Whether or not the Alexandria Defendants were justified in referring Grizzell to counseling, the Court generally agrees that such a referral does not necessarily establish that they regarded her as disabled.  However, the ADAAA has expanded the scope of ADA coverage significantly.   With that in mind, the Court will *assume*, without definitively deciding, that Grizzell was regarded as disabled.[9]  Thus, the Court also presumes that Grizzell has successfully stated a prima facie case of disability discrimination.  The burden now shifts back to the Alexandria Defendants to articulate a legitimate non-discriminatory

9) Even if the Court is too generous in assuming that Grizzell was regarded as having a disability, any errors in this analysis will have no impact on the ultimate disposition of this case.  As explained below, the Alexandria Defendants are entitled to summary judgment on Grizzell's disability discrimination claim because she cannot demonstrate pretext."

reason for his termination.  *Whitfield*, 639 F.3d at 259.

### b.   Legitimate non-discriminatory reason

"A critical attitude toward co-workers and disruptive behavior in the workplace may constitute a legitimate reason for discharge." *Algie v. Northern Ky. Univ.*, 456 F. App'x 514, 517 (6th Cir. 2012) (citing *Lovelace v. BP Prods. N. Am., Inc.*, 252 F. App'x 33, 42-43 (6th Cir. 2007)); *see also Howard v. Magoffin Cnty. Bd. of Ed.*, 830 F. Supp. 2d 308, 317 (E.D. Ky. 2011).  The Sixth Circuit "has repeatedly stated that an employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if that conduct disqualifies the employee from his or her job." *Macy v. Hopkins Cnty. Sch. Bd. of Ed.*, 484 F.3d 357, 366 (6th Cir. 2007) (*abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999); *Brohm v. JH Props., Inc.*, 149 F.3d 517, 521-22 (6th Cir. 1998).

The Alexandria Defendants maintain that they terminated Grizzell's employment due to her disruptive behavior.  (Doc. # 26 at 20-21).  There is support for this assertion in the record.  Some of Grizzell's co-workers submitted affidavits, stating that they became uncomfortable working with her out of fear she would complain about them.  (Docs. # 26-4; 26-6; 31-1 at 25).  Between December 4, 2012 and February 1, 2013, Grizzell made specific demands to Chief Ward and threatened to file an EEOC Charge if he did not comply.  (Doc. # 31-1 at 35-37).  She behaved in a hostile and combative manner towards him.  (Doc. # 26-4).  And even though she testified that she was not afraid of APD personnel, her email referencing Casey's Law and her phone call to Karen Barto suggest otherwise.  (Doc. # 31-1 at 35–37).  Because the Alexandria Defendants have articulated

a legitimate, nondiscriminatory reason for termination, the burden now shifts back to Grizzell to show that their reason is a pretext for discrimination.

### c.     Pretext

A plaintiff may show pretext by demonstrating one of the following: (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the employer's action; or (3) they were insufficient to motivate the employer's action. *Wright v. Memphis Light, Gas & Water Div.*, 558 F. App'x 548, 554 (6th Cir. 2014). The plaintiff must "produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it [took adverse employment action.]" *Id.* (*quoting Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). "[T]emporal proximity alone cannot create a genuine issue of material fact as to whether Defendant's proffered reason for termination was pretext, and that the actual motivation was disability discrimination." *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 798 (6th Cir. 2006).

Grizzell suggests that the proffered reason for termination has no basis in fact because she "was never placed on any notice that her behavior was disrupting the workplace nor was there anything reported by any of the parties or coworkers in depositions or interviews that would support a claim that she was causing a disruption." (Doc. # 27-1 at 22). The Court disagrees. As detailed above, there is evidence in the record to suggest that Grizzell was disruptive, regardless of whether anyone informed her about the effects of her behavior.

Grizzell makes one other argument about pretext: "The Defendants offer support that the Plaintiff's behavior was disruptive by attaching three affidavits that simply say her behavior was disruptive. Nothing more. This alone supports the pretext that has no basis

34

in fact." (Doc. # 37-1 at 16).  The Court again disagrees with Grizzell.  Just because the affidavits share similar language does not render their content untrue.  As observed above, there is deposition testimony to support the assertions contained in the affidavits.  Because Grizzell failed to show that her disruptive behavior was a pretext for discrimination, the Alexandria Defendants are entitled to summary judgment on this claim.

### D.    Grizzell's State Law Claims against Chief Ward

#### 1.    Defamation

To establish a cause of action for defamation under Kentucky law, a plaintiff must prove the following elements: (1) defamatory language; (2) about the plaintiff; (3) which is published; and (4) which causes injury to reputation.  *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004).  "'Defamatory language' is broadly construed as language that 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'"  *Id.* (quoting Restatement (Second) of Torts § 559 (1977)).  A jury should determine, "on the basis of competent evidence, whether a defamatory meaning was attributed to it by those who received the communication.'"  *Id.* (quoting *Yancey v. Hamilton*, 783 S.W.2d 854, 858 (Ky. 1989)).  However, the terms "'should be construed in their most natural meaning and should be 'measured by the natural and probable effect on the mind of the average reader.'"  *Id.* (quoting *Yancey*, 783 S.W.2d at 858).

As for the second element, the plaintiff need not specifically be identified "so long as it was so reasonably understood by plaintiff's 'friends and acquaintances . . . familiar with the incident.'"  *Id.*  Element three, publication, refers to intentional or negligent communication to someone other than the party defamed.  *Id.*  Regarding the final element,

35

Kentucky law retains some archaic distinctions between statements that are defamatory *per se* and *per quod*.  If a statement is defamatory *per se*, "recovery is permitted without proof of special damages because injury to reputation is presumed and the words are 'actionable on their face–without proof of extrinsic facts or explicatory circumstances." Spoken words are slanderous *per se* "only if they impute crime, infectious disease, or unfitness to perform duties of office, or tend to disinherit him."  *Id.* at 795.

> In her Motion For Partial Summary Judgment, Grizzell states as follows:
>
> Defendant Ward incorrectly informed the Plaintiff's co-workers and mother that her behavior was unstable and clearly due to stress.  Once Defendant Ward made the Plaintiff's complaints public, along with what he believed to be her reason for stating the same, she lost the respect of both her coworkers and insubordinates [sic].  He asked her coworkers, including her subordinates, to watch her and make reports back to him.  His actions caused her to lose their respect and inhibit her ability to perform her job duties.  His handling of this situation ultimately led to her termination and interference with her livelihood.

(Doc. # 25 at 14).

As the Alexandria Defendants are quick to point out, there is no evidence in the record that Chief Ward actually commented on Grizzell's mental health to her co-workers. He testified that he asked other supervisors present at the December 4th meeting if he was disrespectful to Grizzell and inquired whether his comments were offensive to other female employees.  (Doc. # 33 at 33-34).  Chief Ward also asked other supervisors to document unusual behavior from Grizzell.  (*Id.*).  However, there is no testimony in the record that he spoke specifically about Grizzell's mental health on any of these occasions.  Grizzell also speculated that Chief Ward, Childers and a few other employees were talking about her in his office on January 31, 2013, but she could not hear their conversation.  (Doc. # 31 at 196-98).  Thus, there is no evidence that he spoke about her mental health on this

36

occasion either.  Absent such evidence, Grizzell cannot demonstrate that Chief Ward made defamatory statements about her.

Grizzell is able to identify one specific statement that Chief Ward made about her mental health.  Although the exact phrasing is disputed, both parties agree that Chief Ward called Grizzell's house and expressed concern about her stress level and/or mental health to her mother.  (Docs. # 33 at 164; 34 at 7).  Even assuming that the statement was defamatory, Grizzell cannot prove that this particular statement caused injury to her reputation.  Because Chief Ward did not "impute crime, infectious disease, or unfitness to perform duties of office," Grizzell must prove special damages.  However, she cannot prove that his statement to her mother actually caused injury to her reputation.  Her mother explicitly testified that she did not believe Chief Ward's comments about her daughter. (Doc. # 34 at 7).  Thus, the Alexandria Defendants are entitled to summary judgment on the defamation claim.

### 2,     Intentional Infliction of Emotional Distress

#### a.     Use as a "Gap-Filler"

Kentucky courts often characterize IIED as a gap-filler tort.  *See, e.g., Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993) ("[W]here an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie.").  Although it can also be "a stand-alone tort under the right facts," the Kentucky Supreme Court has stated that "there can be only one recovery on a given set of facts." *Childers v. Geile*, 367 S.W.3d 576, 582 (Ky. 2012) (acknowledging that IIED may be

37

pleaded in the alternative).

In her Amended Complaint, Grizzell states that Chief Ward "intentionally told others that Plaintiff Grizzell had made false allegations of sexual harassment against him and that she was not mentally stable was outrageous and intolerable," and as a result, "Grizzell suffered severe emotional distress." (Doc. # 10 at 12).  As the Alexandria Defendants point out, Chief Ward's alleged statements about her mental health also form the basis of her defamation claim.  (Doc. # 26 at 24-25).  Because this conduct forms the basis for the more traditional defamation tort, Grizzell cannot base her IIED claim on the same conduct, regardless of whether her defamation claim is ultimately successful.  *See Rigazio*, 853 S.W.2d at 299 (dismissing plaintiff's IIED claim even though all traditional torts were time-barred under the statute of limitations).

Grizzell attempts to save the other half of her IIED claim by suggesting that Chief Ward's statements about Grizzell's false allegations of sexual harassment are not included in her defamation claim.  The Court suspects that this underlying conduct also sounds in defamation, which would preclude Grizzell from recovering under an IIED theory.  However, out of an abundance of caution, the Court will assume that IIED for this conduct is available to Grizzell.

### b.    Outrageous Conduct

Under Kentucky law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *See* Restatement (Second) of Torts § 46.  Kentucky courts have also adopted the following commentary to the Restatement:

38

*Extreme and outrageous conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, and other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs will necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no reason for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam . . .

*Id.*

Stated another way, outrageous conduct is defined as that which "is a deviation from all reasonable bounds of decency and is utterly intolerable in a civilized community." *Craft v. Rice*, 671 S.W.2d 247, 250-51 (Ky. 1984) (finding that the tortfeasor's conduct was outrageous where he kept a woman under surveillance, told her on CB radio that her husband would be put in jail and drove so as to force her into an opposing lane of traffic). *Accord Humana of Ky. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990) (finding that nurse's conduct was "not intentional, outrageous, or reckless under the standards set out in *Craft* and the *Restatement*" where she yelled at patient to "shut up" and informed her that her stillborn baby would be disposed of in the hospital).

39

In support of her claim, Grizzell states that "Defendant Ward questioned his employees over the allegations that Plaintiff Grizzell discussed seeking confirmation that he had never made any of the alleged comments.  Comments that he later admitted to making when deposed." (Doc. # 27-1 at 22).  This statement takes some liberties with the record, as Chief Ward seems to inquire about the offensiveness of his comments rather than their content.  (Doc. # 33 at 33-34).  More importantly, even if Chief Ward told other co-workers that Grizzell had falsely accused him of sexual harassment, Grizzell makes no effort to explain how this qualifies as the kind of outrageous conduct recoverable under IIED.   While the alleged conduct may amount to more than "indignities, threats, annoyances, [and] petty oppression," it is not by much.  It is certainly not so beyond the bounds of decency as to justify recovery on this tort.  For these reasons, the Alexandria Defendants are entitled to summary judgment on Grizzell's IIED claim.

## IV.  Conclusion

Accordingly, for reasons stated herein,

**IT IS ORDERED** as follows:

(1)   Grizzell's Motion for Partial Summary Judgment (Doc. # 25) be, and is, hereby **DENIED**;

(2)   The Alexandria Defendants' Motion for Summary Judgment (Doc. # 26) be, and is, hereby **GRANTED**;

(3)   A Judgment shall be entered contemporaneously herewith.

This 1st day of June, 2015.



Signed By:

*David L. Bunning*   DB

**United States District Judge**

G:\DATA\Opinions\Covington\2014\14-50 MOO granting D MSJ.wpd